### COMMONWEALTH *vs.* HERMAN IRENE.

Essex. October 6, 2011. - June 26, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Robbery. Evidence,* Hearsay, Spontaneous utterance, Medical record, Business record, Hospital record. *Practice, Criminal,* Hearsay, Confrontation of witnesses. *Constitutional Law,* Confrontation of witnesses.

At a criminal trial, there was no error in the admission, as an exception to the hearsay rule, of testimony by several witnesses recounting statements made by a declarant in reaction to having been shot, where the declarant's statements were either spontaneous utterances or expressions of present pain. [605-608]

This court concluded that hospital medical records are not admissible as business records under G. L. c. 233, § 78, where the admissibility of statements in medical records is limited by the provisions in G. L. c. 233 relating to hospital records, including §§ 79 and 79G. [609-616]

At a criminal trial, the judge erred in admitting in evidence a doctor's report containing a hearsay statement made by the defendant, where the report could not be admitted as a business record under G. L. c. 233, § 78 [616], and where, given that the statement bore no apparent relationship to the defendant's treatment or medical history, it was not, without testimony or additional evidence to establish such a relationship, admissible under the exception to the hearsay rule provided by G. L. c. 233, § 79 [616]; however, no prejudice arose from the error, where the Commonwealth's case was not dependent on the asserted admission by the defendant contained in the records, but rather focused on the strong circumstantial evidence of the defendant's guilt that was strengthened by evidence of the defendant's numerous inconsistent statements to police regarding his whereabouts and actions on the night of the robbery [618-619].

Statement that, where out-of-court statements contained in medical records demonstrate on their face that they were included for the purpose of medical treatment, that evident purpose renders the statements both nontestimonial as to the author of the record, and as falling within the scope of G. L. c. 233, § 79, the hospital records statute. [616-618]

INDICTMENT found and returned in the Superior Court Department on March 28, 2007.

A pretrial motion to suppress evidence was heard by *Howard J. Whitehead,* J., and the case was tried before him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Jennifer H. O'Brien* for the defendant.

*Kenneth E. Steinfield*, Assistant District Attorney, for the Commonwealth.

*Dana Alan Curhan*, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

DUFFLY, J. A taxicab driver in Lawrence was robbed at knifepoint by a passenger wearing a hat that covered most of his face; the driver fired his pistol at the fleeing robber, wounding him in the back. Police located the defendant near the scene of the robbery suffering from an apparent gunshot wound to his back, but no witness was able to identify him as the robber. The defendant testified at trial, denying that he was the robber and claiming to have been shot in an unrelated incident by unknown assailants. A Superior Court jury convicted the defendant of armed robbery, G. L. c. 265, § 17. On appeal, the defendant argues that certain statements allegedly made by the fleeing robber were hearsay and should not have been admitted; that a statement attributed to the defendant contained in his medical records ("he was in a taxicab when he got shot") was inadmissible as hearsay; and that, even if not hearsay, the admission of the medical records violated his right to confrontation under the Sixth Amendment to the United States Constitution. We transferred the case to this court on our own motion.

Because we conclude that the trial judge erred in admitting the defendant's medical records under the statutory exception for business records, G. L. c. 233, § 78 (§ 78), and that the disputed portion of the records was not shown to be admissible under the hospital records statute, G. L. c. 233, § 79 (§ 79), we do not reach the defendant's constitutional claim. Determining that the erroneous admission did not prejudice the defendant, however, and that his other claims of error are without merit, we affirm the conviction.[1]

*Background.* We summarize the facts the jury could have

---

[1] We acknowledge the amicus brief filed by the Committee for Public Counsel Services in support of the defendant.

found, reserving certain details for later discussion. In the early morning hours of January 28, 2007, Bienvenido Rodriguez was driving his taxicab, a minivan, when he responded to a dispatch call for a frequent passenger, David Christian, a bartender at a local tavern. Rodriguez picked up Christian, who sat in the first row of seats behind Rodriguez, and drove toward Christian's destination. As he was turning off Springfield Street, Rodriguez saw a man waving and stopped to pick him up. The man was wearing a dark jacket and a hat that covered his ears and most of his face; he asked to be taken to Lowell Street and got into the front passenger seat.

After driving a few blocks, the man told Rodriguez in Spanish to stop. He then grabbed Rodriguez's head, brandished a knife, and demanded that Rodriguez show him where he kept his money. A brief struggle ensued before Rodriguez brought the taxicab to an abrupt stop. At some point, Rodriguez gestured to the driver's side visor, where he kept his money secured by an elastic band. The robber took the money from the visor; he then left the taxicab and ran in the direction of a bridge underpass located at the intersection of Parker and Market Streets.

Rodriguez got out and pulled a .40 caliber pistol from his waistband.[2] He struggled with the weapon for a moment, ejecting one live round from the chamber while attempting to disengage the safety. He then fired at least one shot in the direction of the fleeing robber.[3]

Christian, who initially did not realize what was happening, remained in the taxicab throughout the encounter and attempted to reach Lawrence police on his cellular telephone. Michael Caraballo, another taxicab driver who worked for the same company as Rodriguez, drove by Rodriguez's taxicab just after it had come to a stop. Caraballo and Wilfredo Colon, Caraballo's passenger, both saw Rodriguez struggling with the front-seat passenger. Caraballo pulled over near the bridge at Parker

[2]Bienvenido Rodriguez was licensed to carry the firearm.

[3]The testimony varied as to how many times and in what direction Rodriguez fired the gun. Rodriguez testified that he fired one time and was unsure whether he shot "upwards, downwards or to the side." David Christian testified that he heard "two to three shots." A third witness, Wilfredo Colon, testified to hearing only one gunshot, and stated that the gun had been aimed toward the robber.

and Market Streets to make radio contact with the taxicab company, then drove back to Rodriguez's taxicab.

Caraballo and Colon observed Rodriguez get out of his taxicab and fire his gun at the robber as the man ran toward the bridge. Rodriguez, Caraballo, and Colon each heard the man exclaim and indicate that he had been hit.[4] He stumbled and momentarily fell to the ground, dropping his hat; he then continued running down Parker Street before turning left onto Market Street.

Responding to a radio broadcast regarding the incident, Officer Eric Cerullo of the Lawrence police department reached the area less than five minutes after the shooting. He drove around the area in search of the robber, who had been described as a light-skinned Hispanic male in a black leather jacket. Cerullo passed Market Street and turned onto Springfield Street. He had traveled between thirty yards and forty yards when he observed the defendant emerge from an alley between two houses and wave for help. The defendant was wearing a light shirt and no jacket. A Lawrence detective, who also had been in the area, drove down Springfield Street at the same time as Cerullo. The officers approached the defendant, who told Cerullo that he had been shot. Cerullo noticed "a dark blood spot" on the back of the defendant's shirt; when the defendant opened his shirt, Cerullo saw blood "pouring out" from an apparent gunshot wound.

The defendant was transported by ambulance to Lawrence General Hospital, where he denied that he had been in a taxicab before being shot.[5] The defendant was transferred to Brigham and Women's Hospital in Boston for surgery.[6] Following the

---

[4]This statement, as recounted by the three witnesses, is the basis for the defendant's hearsay argument and is discussed more fully infra.

[5]A Lawrence detective interviewed the defendant about the robbery while he was at Lawrence General Hospital. The interview was not recorded, and the detective did not provide Miranda warnings. The detective determined that there were warrants for the defendant's arrest, unrelated to the robbery of Rodriguez, and placed him under arrest before he was transferred to Brigham and Women's Hospital in Boston. The defendant was not charged with the robbery until some point after his surgery at Brigham and Women's Hospital for a gunshot wound to his lower back, and after detectives had interviewed him a second time. The defendant has raised no issue regarding his arrest or questioning by police.

[6]The defendant's medical records, admitted in evidence, include an entry by a treating physician that notes, "The patient states that he was minding his own

surgery,[7] another detective and a police lieutenant interviewed the defendant at the hospital; the defendant consented to audio recording of the interview and signed an acknowledgment of his Miranda rights. The defendant told the detective that he had argued with his wife and left their apartment wearing a black leather shearling jacket and matching hat, and went for a long walk. He first said he had been shot on Market Street. He then said that he had been approached on Parker Street near Market Street by a car full of "punks," and that one of the passengers said he wanted the defendant's jacket. The defendant heard a "pow," fell, then got up and ran.

Police recovered one spent shell casing and one live round of ammunition from the ground near Rodriguez's taxicab. Police also found the robber's fur-lined hat on a sidewalk approximately ten feet behind the taxicab.[8] Deoxyribonucleic acid (DNA) collected from the exterior of the hat was later found to be a match for the defendant's DNA.[9] Witnesses described the robber as a light-skinned, clean-shaven Hispanic male of average height and medium build, who had been wearing a dark coat and a hat.[10]

The defendant's trial testimony as to where he was shot placed

business while he was in a taxicab when he got shot." On appeal, the defendant challenges the admission of this statement, and we discuss the issue *infra*.

[7]There was no evidence of a bullet or bullet fragments having been removed from the defendant's body during surgery.

[8]Police searched the area between the scene of the robbery and where the defendant was found, but they did not recover a jacket, a knife, the stolen money, or any discharged bullet or fragments.

[9]A deoxyribonucleic acid (DNA) analyst from the State police crime laboratory testified that four separate DNA tests were performed on the hat. Initial testing of a swab taken from the interior forehead portion of the hat provided insufficient DNA for analysis. Subsequent swabs of the entire interior, entire exterior, and a second swab of the interior forehead portion revealed a mixed DNA profile from at least three people. The defendant could not be excluded from the swabs of the entire interior or the interior forehead portion of the hat. Testing of the swab from the exterior of the hat revealed a major profile that was a match for the defendant's DNA.

[10]Rodriguez was not able to identify the defendant from a photographic array that included the defendant's photograph. At trial, Rodriguez identified the defendant as the robber, apparently surprising the Commonwealth, which had argued in its opening statement, and assured the judge, that no such identification would occur. Further questioning by the Commonwealth as well as defense counsel revealed that Rodriguez may have based his identification on seeing

him several blocks away from the location he had described to the detectives and, consequently, away from the location of the robbery. He denied having been in a taxicab that night, having robbed a taxicab driver, or having been shot by one. He also denied owning the fur-lined hat found at the scene of the robbery and introduced in evidence at trial.

The defendant argues that evidence of the fleeing robber's statements constituted inadmissible hearsay. He claims also that the statement, recorded in his medical records, that he was in a taxicab when he was shot was improperly admitted as a business record and, in any event, violated his right to confront the doctor who authored the report. The defendant contends that, without the erroneously admitted evidence, the Commonwealth's evidence is insufficient to sustain a conviction.

*Discussion.* 1. *The robber's statements.* The defendant challenges testimony from three witnesses regarding statements or exclamations made by the robber just after Rodriguez fired his gun, each to the effect that the robber reacted to having been shot. The defendant argues that the statements or exclamations constitute inadmissible hearsay admitted substantively to establish that the robber was in fact hit by the bullet fired from Rodriguez's gun.

Caraballo testified, without objection, that the robber said, " 'He hit me, he hit me' or 'crap' or something like that."[11] Colon testified, also without objection, that the robber said, "I got hit, I got hit." Rodriguez answered a series of questions regarding the sequence of events that began with the robber running from the taxicab and continued to the point that Rodriguez fired his gun. When the prosecutor asked, "Did you see anything occur as [the robber] was running?" Rodriguez was permitted to respond, over the defendant's objection, "I heard that he said, 'Oh, my mother, my mother.' "

---

the defendant's photograph on a news broadcast and an Internet Web site, and also seeing the defendant in shackles at an earlier court proceeding. In closing argument, the prosecutor suggested to the jury that they disregard the in-court identification. The defendant did not object and raises no issue on appeal pertaining to Rodriguez's identification.

[11]Caraballo testified that he heard the robber say in Spanish "cabron," which he said is a "bad word" that he understood to mean "crap" in English. See *Commonwealth* v. *Mercado*, 456 Mass. 198, 200 n.3 (2010).

The defendant argues that the phrase "I heard that he said," suggests that Rodriguez heard about the robber's statement from another person and was therefore not testifying from personal knowledge. See *Commonwealth* v. *Harbin*, 435 Mass. 654, 657 (2002) (witness may not testify unless evidence supports finding that witness has personal knowledge of matter about which he is testifying). See also Mass. G. Evid. § 602 (2012).

We do not agree with the defendant's characterization of Rodriguez's testimony. The question asked Rodriguez to recount a personal observation; based on his answer, provided through a Spanish language interpreter, it may fairly be inferred that Rodriguez was testifying from personal knowledge to what he heard the robber exclaim.[12] We conclude that the testimony of all three witnesses was properly admitted as an exception to the hearsay rule, either as a spontaneous utterance, see Mass. G. Evid., *supra* at § 803(2), or as an expression of a "present physical condition such as pain."[13] *Id.* at § 803(3)(A).

A statement is admissible as a spontaneous utterance if "(1) there is an occurrence or event 'sufficiently startling to render inoperative the normal reflective thought processes of the

---

[12] Any remaining confusion was dispelled through cross-examination. Defense counsel inquired of Rodriguez, "Now, sir, on direct examination, you said that you heard this person yelling out, 'Oh, my mom,' do you recall saying that." Rodriguez responded, "Yes, after the shot hit him."

[13] The Commonwealth contends that the statement also could have been admitted in evidence as an admission by the defendant. See Mass. G. Evid. § 801(d)(2)(A) (2012). In order for a statement to be admissible as an admission of the defendant, the judge must make a preliminary finding of fact that the defendant made the statement. See *Commonwealth* v. *Lopes*, 459 Mass. 165, 174 (2011); Mass. G. Evid., *supra* at § 104(a). Because the relevance of the statement is conditional on this preliminary finding of fact, the judge must also instruct the jury to consider the evidence only if they find that the defendant made the statement. See *Commonwealth* v. *Perry*, 432 Mass. 214, 234 (2000) (statements made by coventurers); *Commonwealth* v. *Key*, 381 Mass. 19, 22 & n.1 (1980) (dying declaration). See also Mass. G. Evid., *supra* at § 104(b). In light of the evidence in this case, the jury reasonably could have found that the defendant made the statement that he was shot only if they concluded from other evidence that he was the person shot by Rodriguez and, therefore, was the person who robbed Rodriguez. Because we conclude that the statement is admissible on other grounds we need not address whether, in the unique circumstances of this case, the statement would have been admissible as an admission of the defendant.

observer,' and (2) if the declarant's statement was 'a spontaneous reaction to the occurrence or event and not the result of reflective thought.' " *Commonwealth* v. *Santiago*, 437 Mass. 620, 623 (2002), quoting 2 McCormick, Evidence § 272, at 204 (5th ed. 1999). We have viewed the circumstances of being shot, or witnessing a shooting, as sufficiently startling to impede normal reflective thought processes. See, e.g., *Commonwealth* v. *Simon*, 456 Mass. 280, 296, cert. denied, 131 S. Ct. 181 (2010); *Commonwealth* v. *Cohen*, 412 Mass. 375, 391-392 (1992); *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 215, 222-223 (1973). The witnesses testified that, after the gun was fired, they saw the robber fall and then heard the robber state he had been "hit" or utter an exclamation from which it could be inferred that he had been hit. The context and nature of the utterances indicate that the robber was reacting to the experience of sudden pain from a gunshot wound. Because both criteria of the spontaneous utterance exception were satisfied, the testimony was admissible.

This evidence also supports a finding that the testimony related to the robber's "expressions of present pain." *Murray* v. *Foster*, 343 Mass. 655, 658 (1962). See *Roosa* v. *Boston Loan Co.*, 132 Mass. 439, 439 (1882). The rule was discussed in *Bacon* v. *Charlton*, 7 Cush. 581, 586 (1851):

> "The rule of law is now well settled, and it forms an exception to the general rules of evidence, that where the bodily or mental feelings of a party are to be proved, the usual and natural expressions of such feelings, made at the time, are considered competent and original evidence in his favor. And the rule is founded upon the consideration, that such expressions are the natural and necessary language of emotion, of the existence of which, from the very nature of the case, there can be no other evidence."

Whether the expressions are "real or feigned" is for the jury to determine "by the manner of them, and the circumstances under which they are proved to have been made." *Id.* Evidence of such expressions is limited to "such complaints, exclamations and expressions as usually and naturally accompany, and furnish evidence of, a present existing pain or malady." *Id.* Here, the

evidence could properly have been admitted as an expression of the robber's present pain.

2. *Medical records.* At Brigham and Women's Hospital, a treating physician drafted a one-page report two days after examining the defendant; the report noted, "The patient states that he was minding his own business while he was in a taxicab when he got shot."[14] The doctor was not called to testify. Instead, after the judge ruled that the defendant's statement would have to be redacted if the document were offered under the hospital records statute, § 79, the Commonwealth sought to establish, through testimony of an "information specialist" from Brigham and Women's Hospital, that the defendant's hospital medical records qualified as business records. See G. L. c. 233, § 78. The defendant objected, arguing that hospital medical records could not be admitted pursuant to § 78, but must be admitted, if at all, under § 79.[15] The judge overruled the objection and allowed the medical record that included the defendant's statement to the doctor to be admitted as a business record. On appeal, the defendant argues also that introduction of the report violated his confrontation rights under the Sixth Amendment, an argument not made at trial.[16]

---

[14]The pertinent paragraph of the report reads:

> "HISTORY OF PRESENT ILLNESS: In essence, this is a 36-year-old male who was transferred from an outside facility status post GSW to the back exiting his abdomen. The patient states that he was minding his own business while he was in a taxicab when he got shot. He got shot once, did not lose consciousness, and was transported by EMS to an outside hospital where a CT demonstrated no major intra-abdominal organ damage but some free blood in the abdomen. He was transported to our Emergency Department for further evaluation and care. He did have some right lower extremity pain after this injury."

[15]At trial, and in his brief, the defendant cited G. L. c. 233, § 79G (§ 79G). The parties agree, as the Commonwealth states in its brief, that the defendant intended to cite § 79.

[16]Although the defendant objected to the introduction of the treating physician's report at trial, the objection was not based on his right to confrontation or any other alleged constitutional infirmity. Consequently, any violation of the defendant's rights under the confrontation clause of the Sixth Amendment to the United States Constitution would be reviewed for a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Munoz,* 461 Mass. 126, 129-130 (2011).

Where a defendant claims that the admission of an out-of-court statement violates his rights under the confrontation clause, we undertake a two-step inquiry. First, we examine whether the statement is admissible under ordinary evidence rules, "i.e., whether it qualifies as a hearsay exception." *Commonwealth* v. *Nesbitt*, 452 Mass. 236, 243 (2008), quoting *Commonwealth* v. *Burgess*, 450 Mass. 422, 431 n.6 (2008). If it is admissible pursuant to a hearsay exception, we then consider "whether admission of the statement is prohibited by the confrontation clause of the Sixth Amendment." *Commonwealth* v. *Linton*, 456 Mass. 534, 548 (2010).

a. *Business records exception.* In order to determine whether a hearsay exception supports admission of the defendant's statement, we must first determine whether the defendant's hospital medical records were properly admitted as business records under § 78.[17] We have not previously addressed whether hospital medical records, ordinarily admitted through § 79, may also be admitted as business records under § 78. The Commonwealth argues that the language of § 78 supports a broad definition of business records that includes medical records within its ambit, and that §§ 78 and 79 provide alternative avenues for establishing the admissibility of hospital medical records. In other words, if a party establishes that a hospital medical record meets the statutory predicates to admissibility set forth in § 78, the Commonwealth contends that the document should be admissible under that provision even if it would not be admissible under § 79.[18] For the reasons discussed below, we conclude that hospital medical records are not admissible under § 78, and that

---

[17]Although the defendant argues in his brief that the statement attributed to him by the doctor was irrelevant to treatment and diagnosis and therefore was inadmissible under G. L. c. 233, § 79 (§ 79), he did not argue explicitly that the admissibility of hospital records is limited to that statute. At oral argument, however, counsel for the defendant reiterated his claim, made below, that the Commonwealth had impermissibly used G. L. c. 233, § 78 (§ 78), to "circumvent" the limitations of § 79. We therefore consider the defendant's claim to have been preserved and review for prejudicial error. See *Commonwealth* v. *Cruz*, 445 Mass. 589, 591 (2005).

[18]We reject the Commonwealth's argument that, because the defendant's statement in the doctor's report was not admitted for its truth but for its falsity and, thus, was not hearsay, we need not reach the question whether the statement was properly admitted under § 78. Cf. *Commonwealth* v. *Brum*, 438 Mass. 103, 116-117 (2002). Here, although the statement also could have been

the judge erred in admitting the doctor's report as a business record.

We begin by examining the statutory scheme governing admission of business and hospital records, applying settled principles of statutory construction. "It is a fundamental canon of statutory construction that 'statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result.'" *Boston Hous. Auth.* v. *National Conference of Firemen & Oilers, Local 3*, 458 Mass. 155, 162 (2010), quoting *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001). Statutes that relate to the same subject matter are not to be construed "in a way that produces absurd or unreasonable results when a sensible construction is readily available." *Manning* v. *Boston Redev. Auth.*, 400 Mass. 444, 453 (1987). Where two statutory provisions conflict, "we have stated that the more specific provision, particularly where it has been enacted subsequent to a more general rule, applies over the general rule." *Doe* v. *Attorney Gen. (No. 1)*, 425 Mass. 210, 215-216 (1997), citing *Lukes* v. *Election Comm'rs of Worcester*, 423 Mass. 826, 829 (1996). See 2B N.J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 51:2 (7th ed. 2008) ("Where a conflict exists the more specific statute controls over the more general one").

Section 78 permits business records to be admitted to prove the truth of statements contained therein if the judge finds:

> "(1) the entry, writing, or record was made in good faith; (2) in the regular course of business; (3) before the beginning of the civil or criminal proceeding in which it is offered; and (4) it was the regular course of such business to make such memorandum at the time of such act, transaction, occurrence, or event, or within a reasonable time thereafter."

used to impeach the defendant's trial testimony that he was not in the taxicab, it was not admitted for that purpose; its primary function was to place the defendant in the taxicab where the robbery he was charged with committing took place. This view of the evidence is supported by the prosecutor's closing argument, in which he stated: "I'd suggest to you he was in the taxicab and that he wasn't minding his own business unless his business was robbing the taxicab driver."

*Commonwealth* v. *Siny Van Tran*, 460 Mass. 535, 548 (2011), citing G. L. c. 233, § 78.[19] We have said that business records meeting these requirements are presumed to be reliable, and therefore admissible, "because entries in these records are routinely made by those charged with the responsibility of making accurate entries and are relied on in the course of doing business." *Wingate* v. *Emery Air Freight Corp.*, 385 Mass. 402, 406 (1982).

By contrast, § 79 provides that "[r]ecords kept by hospitals, dispensaries or clinics, and sanatoria" in accordance with State law may be admitted in evidence "so far as such records relate to the treatment and medical history of such cases." Section 79 also includes the specific limitation that nothing contained in the records "shall be admissible as evidence which has reference to the question of liability." *Id.* A related provision governs the admissibility, after certain preconditions have been met, of specified "hospital medical records, relating to medical, dental, hospital services, prescriptions, or orthopedic appliances rendered to or prescribed for a person injured, or any report of any examination of said injured person." G. L. c. 233, § 79G (§ 79G). Such reports are admissible as evidence of the diagnosis,

---

[19]Section 78 states in relevant part:

"An entry in an account kept in a book or by a card system or by any other system of keeping accounts, or a writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall not be inadmissible in any civil or criminal proceeding as evidence of the facts therein stated because it is transcribed or because it is hearsay or self-serving, if the court finds that the entry, writing or record was made in good faith in the regular course of business and before the beginning of the civil or criminal proceeding aforesaid and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter. For the purposes hereof, the word 'business', in addition to its ordinary meaning, shall include profession, occupation and calling of every kind. . . . When any such entry, writing or record is admitted, all other circumstances of the making thereof, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight and when such entry, writing or record is admitted in a criminal proceeding all questions of fact which must be determined by the court as the basis for the admissibility of the evidence involved shall be submitted to the jury, if a jury trial is had for its final determination."

prognosis, and opinions of a physician as to the proximate cause of the condition so diagnosed. *Id.* See *Law* v. *Griffith*, 457 Mass. 349, 352 (2010); M.S. Brodin & M. Avery, Massachusetts Evidence § 8.11.3, at 539 (8th ed. 2007).

Subject to the preconditions and limitations set forth in these provisions, we have considered the contents of hospital medical records to be reliable, "because the entries relating to treatment and medical history are routinely made by those responsible for making accurate entries and are relied on in the course of treating patients." *Doyle* v. *Dong*, 412 Mass. 682, 685 (1992), citing *Bouchie* v. *Murray*, 376 Mass. 524, 528 (1978).[20] Notwithstanding the presumptive reliability of hospital medical records, because sections of G. L. c. 233 governing admission of hospital medical records contain specific limitations, the Legislature could not have intended that those limitations could be circumvented merely by invoking § 78 as the basis for admissibility. See *Connors* v. *Annino*, 460 Mass. 790, 796 (2011), quoting *Wheatley* v. *Massachusetts Insurers Insolvency Fund*, 456 Mass. 594, 601 (2010) (we "endeavor to interpret a statute to give effect 'to all its provisions, so that no part will be inoperative or superfluous' ").

Our decisions have long recognized that the specific limitations set forth in § 79 may preclude admission of some aspects of a medical record. In *Bouchie* v. *Murray, supra* at 531, we established a four-part test "to determine the admissibility of material contained in a hospital record." As to the first of these prongs, we have said that "the document must be the type of

---

[20]In addition, both § 79 and § 79G set forth procedural requirements for admissibility distinct from those required by § 78. Section 79 mandates that medical records "shall be certified by the affidavit of the person in custody thereof to be a true and complete record, and shall be delivered by such hospital . . . to the clerk of such court." Section 79G requires that the hospital medical record be "subscribed and sworn to under the penalties of perjury by the physician" or authorized agent of the hospital rendering the services, and further requires written notice of the intent to offer the report in evidence, along with a copy of such report.

There are no similar requirements for admission of business records under § 78. In criminal proceedings, however, § 78 requires that "all questions of fact which must be determined by the court as the basis for the admissibility of the evidence involved shall be submitted to the jury." Neither § 79 nor § 79G contains a similar requirement.

record contemplated by [§ 79]." *Id.* Although we interpret the terms of § 79 liberally, see *Commonwealth* v. *Dargon,* 457 Mass. 387, 394 (2010), we recognize that the Legislature has created a statute that is limited in scope and "is not to be interpreted as rendering admissible all the contents of hospital records." *Bouchie* v. *Murray, supra* at 528. The Commonwealth's assertion that § 78 provides an alternative avenue for the introduction of hospital medical records would undermine these limitations and nullify our long-standing interpretation of § 79. Moreover, although a presumption of reliability is attributed to business as well as to hospital medical records, the provisions of G. L. c. 233 concerning admissibility of these respective types of records were enacted to address different concerns.[21]

Section 78 was enacted as a legislative response to the perception that common-law hearsay rules regarding business records "were wholly inadequate to meet the needs and realities of a modern industrial and commercial society." *Wingate* v. *Emery Air Freight Corp., supra* at 409 (Liacos, J., concurring), citing 5 J. Wigmore, Evidence §§ 1521, 1522, 1561a, 1561b (Chadbourn rev. ed. 1974). The common-law hearsay exception for business records, which permitted a written record made in the usual course of business to be admitted in evidence only if the author had died, see *Delaney* v. *Framingham Gas Fuel & Power Co.,* 202 Mass. 359, 366-367 (1909), was regarded as having little relation "to the practical trustworthiness of the documents offered," 5 J. Wigmore, *supra* at § 1561a. The Legislature's enactment of § 78 reflected its recognition of the reliance that

---

[21]The Legislature first enacted § 79 in 1905, see St. 1905, c. 330, § 2; limiting language relating to "treatment and medical diagnosis" and "question[s] of liability" was added in 1912. See St. 1912, c. 442, § 2. The business records section, § 78, was enacted a year later. See St. 1913, c. 288. That § 78 was enacted after § 79, and yet makes no reference to the then-existing provisions on medical records, lends further support to our conclusion that the Legislature did not intend to abrogate or nullify the limiting provisions relating to hospital medical records. Moreover, the Legislature has amended § 79 on three occasions since it last amended § 78 in 1954, further indicating the Legislature's continuing preference for assessing the admissibility of hospital medical records under the statutory provisions expressly relating to such documents. See St. 1974, c. 225; St. 1959, c. 200; St. 1957, c. 206, § 1. We decline to construe § 79 "in a way that produces absurd or unreasonable results when a sensible construction is readily available." *Manning* v. *Boston Redev. Auth.,* 400 Mass. 444, 453 (1987).

the modern commercial world placed on the accuracy of routine records created in the course of doing business, and addressed the need for a rule of evidence that embodied society's confidence in the reliability of those records. See *Wingate* v. *Emery Air Freight Corp., supra* at 410 (Liacos, J., concurring), quoting 5 J. Wigmore, *supra* at § 1530 (business records "are the ultimate basis of calculation, investment, and general confidence in every business enterprise . . . . It would seem that expedients which the entire commercial world recognize as safe could be sanctioned, and not discredited, by courts of justice").

Section 79, by contrast, was enacted "primarily to relieve the physicians and nurses of public hospitals from the hardship and inconvenience of attending court as witnesses to facts which ordinarily would be found recorded in the hospital books." *Commonwealth* v. *Gogan*, 389 Mass. 255, 263 (1983), quoting *Leonard* v. *Boston Elevated Ry.*, 234 Mass. 480, 482 (1920). As Professor Wigmore described, "amidst the day-to-day details of scores of hospital cases, the physicians and nurses can ordinarily recall from actual memory few or none of the specific data entered; they themselves rely upon the record of their own action; hence, to call them to the stand would ordinarily add little or nothing to the information furnished by the record alone." 6 J. Wigmore, Evidence § 1707 (Chadbourn rev. ed. 1976).

Moreover, the Legislature's decision to authorize the introduction of medical opinions through § 79G is particularly significant in light of the absence of any similar provision in § 78 permitting admission of opinions in business records. See *Julian* v. *Randazzo*, 380 Mass. 391, 393 (1980), and cases cited. It is apparent that the Legislature, through its enactment of §§ 79 and 79G, intended that medical records be treated differently from the records of other businesses. Cf. *Ricciardi* v. *Children's Hosp. Med. Ctr.*, 811 F.2d 18, 21-22 & n.3 (1st Cir. 1987) (contrasting separate Massachusetts statutes governing business records and medical records with Federal Rules of Evidence, which contain only one rule governing such records which is "not specifically aimed at hospital records").

Our understanding of the differences between the provisions on business and medical records was expressed in an early decision, *Kelley* v. *Jordan Marsh Co.*, 278 Mass. 101, 109-111

(1932), which addressed the relationship between § 79 and the common-law public records exception. In that case, the plaintiff sought to admit the statement of a decedent that had been recorded in her hospital record. He claimed that the statement, offered to support his claim of liability, was admissible as a declaration of a deceased person under G. L. c. 233, § 65, and that the record was admissible as a public record; as such, the plaintiff claimed, the entry "constituted prima facie evidence that the fact so stated was true." *Id.* We noted that § 79 provided for the admission in evidence of records relating to treatment and medical history, but that evidence of liability was not admissible. We said that § 79 "by its true construction does not give probative force to entries in hospital records which as to their admissibility and evidentiary value depend upon other provisions of the statutes." *Id.* at 110-111. Interpreting the separate provisions within G. L. c. 233 "so as to constitute an harmonious and consistent body of law," *id.* at 111, we concluded:

> "The final clause of § 79, to the effect that entries in such hospital records shall not be competent upon the question of liability, forbids the use of declarations of deceased persons in the way here urged. Hospital records do not become admissible as general public records to any greater or other extent than permitted by said § 79."

*Id.*

Since that time, our decisions have concluded consistently that where a patient's medical records are involved — that is, where the documents involve "medical facts" about a patient, see *Commonwealth* v. *Franks*, 359 Mass. 577, 580 (1971) — admissibility of those records must be determined under § 79. See *McClean* v. *University Club*, 327 Mass. 68, 75 (1951) ("Hospital records are hearsay evidence which are made competent evidence subject to the conditions and limitations prescribed by the statute").[22] See also *Commonwealth* v. *Dargon,*

---

[22]That we referred to hospitals as businesses in two cases cited by the Commonwealth does not detract from our interpretation of the statute. In *Commonwealth* v. *Hogg*, 365 Mass. 290, 294 (1974), the record at issue was a nurse's receipt for a bullet removed from a victim's body. No patient medical record was involved in that case, nor in *Brockton Hosp.* v. *Cooper*, 345 Mass. 616, 617 (1963), which involved a bill of itemized hospital charges.

457 Mass. 387, 394-395 (2010); *Commonwealth* v. *Dube*, 413 Mass. 570, 573-574 (1992); *Doyle* v. *Dong*, 412 Mass. 682, 685 (1992); *Commonwealth* v. *Franks, supra* at 579-580.

We conclude that the business records hearsay exception in § 78 may not be used to expand the scope of the hearsay exception for hospital medical records. The admissibility of statements in medical records is limited by the provisions in G. L. c. 233 relating to hospital records, including §§ 79 and 79G. Accordingly, the defendant's objection to the admission of his medical records under § 78 should have been sustained.

b. *Hospital records exception.* Our conclusion that the defendant's medical records were not admissible under § 78 does not resolve whether the hearsay statement at issue was otherwise admissible under § 79. We conclude that it was not. As the judge determined implicitly, the statement recorded in the defendant's hospital medical records — "patient states that he was minding his own business while he was in a taxicab when he got shot" — does not, on its face, bear any apparent relationship to the defendant's treatment or medical history. Thus, without testimony or additional evidence to establish that the statement was germane to the defendant's treatment or medical history, see *Bouchie* v. *Murray*, 376 Mass. 524, 531 (1978), the defendant's statement contained in his medical records was not admissible under the exception to the hearsay rule provided by § 79.[23]

c. *Confrontation clause.* Because we conclude that the portion of the defendant's medical records containing his statement was not admissible under any exception to the rule against hearsay, we need not reach the question whether introduction of the statement violated the defendant's confrontation rights under the Sixth Amendment.[24] See *Commonwealth* v. *Linton*, 456 Mass.

---

[23]In cases where statements contained in hospital medical records demonstrate, on their face, that they were included in the report for medical treatment purposes, we have held that they may be admitted as part of a medical record under § 79. See, e.g., *Commonwealth* v. *DiMonte*, 427 Mass. 233, 241-242 (1998) (even though incidental to question of liability, fact-specific references to reported cause of wife's injuries admissible as part of medical history and relevant to treatment). See also *Commonwealth* v. *Lampron*, 65 Mass. App. Ct. 340, 343-344 (2005) ("There is no doubt in this case that the medical personnel obtained and recorded the information contained in the medical records for the purpose of treating the defendant").

[24]As noted above, the defendant raises his constitutional claim for the first

534, 548 (2010); *Commonwealth* v. *Arrington*, 455 Mass. 437, 441 (2009). Nevertheless, because the issue has been fully briefed by the parties and amicus curiae, we discuss briefly the relationship between medical records and the confrontation clause. See *Middleborough* v. *Housing Appeals Comm.*, 449 Mass. 514, 522 (2007) (addressing claim where "fully briefed and argued" and resolution would aid public policy in eliminating uncertainty on issue).

The confrontation clause bars the admission of testimonial out-of-court statements by a witness who does not appear at trial unless the witness is unavailable to testify and the defendant had an earlier opportunity for cross-examination. See *Crawford* v. *Washington*, 541 U.S. 36, 53-54 (2004). Whether a particular statement is "testimonial" lies at the core of this analysis. See *Davis* v. *Washington*, 547 U.S. 813, 823-824 (2006). In *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 312 n.2 (2009) (*Melendez-Diaz*), the United States Supreme Court stated that "medical reports created for treatment purposes" are not testimonial under the Sixth Amendment. Cf. *Giles* v. *California*, 554 U.S. 353, 376 (2008) ("statements to physicians in the course of receiving treatment" are not subject to Sixth Amendment strictures). Although directed to different concerns, the class of medical records that do not constitute testimonial statements, as articulated by the Court in *Melendez-Diaz*, is substantially similar to the type of hospital records admissible

time on appeal. Although the defendant's trial occurred before the United States Supreme Court decided *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305 (2009) (*Melendez-Diaz*), an objection at trial to the admission of his medical records based on confrontation clause principles would not have been futile. The question whether statements in a defendant's medical records were admissible under the confrontation clause absent in-court testimony was a live issue in the Commonwealth prior to *Melendez-Diaz*, see, e.g., *Commonwealth* v. *Lampron*, *supra* at 344-345, and therefore an objection on that basis was necessary to preserve the defendant's claim. Cf. *Commonwealth* v. *Barbosa*, 457 Mass. 773, 792 n.16 (2010), cert. denied, 131 S. Ct. 2441 (2011) (where confrontation clause objection as to expert testimony would not have been futile, claim not preserved). Contrast *Commonwealth* v. *Vasquez*, 456 Mass. 350, 356-358 (2010) (because objection at trial to admission of certificates of drug analysis would have been futile under our decisional law prior to *Melendez-Diaz*, we treat confrontation clause claim as preserved on appeal). Had the defendant preserved his constitutional claim, our review would be to determine whether the error was harmless beyond a reasonable doubt. See *Commonwealth* v. *Durand*, 457 Mass. 574, 586 (2010).

under § 79. See *Commonwealth* v. *Sheldon*, 423 Mass. 373, 376 (1996), quoting *Bouchie* v. *Murray, supra* at 531 (§ 79 "contemplates recorded information that relates to medical treatment and to history obtained 'for purposes of medical diagnosis or treatment' ").

Because of these similarities, where statements contained in hospital medical records demonstrate, on their face, that they were included for the purpose of medical treatment, that evident purpose renders the statements both nontestimonial as to the author of the record, and as falling within the scope of § 79. See, e.g., *Commonwealth* v. *Lampron*, 65 Mass. App. Ct. 340, 343-345 (2005) ("There is no doubt in this case that the medical personnel obtained and recorded the information contained in the medical records for the purpose of treating the defendant"; "[t]he notations . . . clearly are related to evaluating his condition at the time of his admission" and are therefore nontestimonial). Cf. *Commonwealth* v. *DiMonte*, 427 Mass. 233, 241-242 (1998) (holding, prior to *Crawford* v. *Washington, supra*, that references to reported cause of wife's injuries were plainly admissible under § 79, but statements reporting ultimate conclusion of crime charged should have been redacted).[25]

d. *Effect of erroneously admitted statement.* Having determined that, in this case, it was error to admit the defendant's medical records as business records, we consider whether the error prejudiced the defendant. See note 17, *supra.* An error is not prejudicial if it "did not influence the jury, or had but very slight effect." *Commonwealth* v. *Cruz*, 445 Mass. 589, 591 (2005), quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353

---

[25]Where, however, it is unclear whether a statement relates to treatment or medical history, the party offering the records must establish through additional evidence that the record is admissible under § 79. See *Commonwealth* v. *Dunne*, 394 Mass. 10, 16 (1985) (party offering medical records bears burden of establishing admissibility). Such evidence will ordinarily be offered through the testimony of medical personnel who treated the patient and are in a position to provide medical context about the information contained in the document. See, e.g., *Commonwealth* v. *Dargon*, 457 Mass. 387, 393 (2010); *Commonwealth* v. *DeOliveira*, 447 Mass. 56, 62 (2006); *Commonwealth* v. *Dyer*, 77 Mass. App. Ct. 850, 855 (2010). In-court testimony from the author of a medical record, introduced to establish that it was made for purposes of medical treatment, also addresses any confrontation clause issues concerning that record because the author is made available for cross-examination.

(1994). If we cannot conclude " 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error,' then it is prejudicial." *Id.*, quoting *Commonwealth* v. *Flebotte*, *supra.* We conclude that there was no prejudice from the erroneous admission.

The Commonwealth's case was not dependent on the asserted admission by the defendant, but focused on evidence that police found the defendant with a gunshot wound to his back not far from the scene of the robbery, and within only minutes of Rodriguez's shooting the robber as he fled. Witnesses testified that the robber fell (a description that matched the defendant's own statement regarding his response to having been shot in the back by "punks"), and exclaimed or stated he had been "hit." Additionally, DNA evidence connected the defendant to the robber's black, fur-lined hat, as did the defendant's own admission that on the night in question he had been wearing a hat that matched his black leather shearling jacket. Thus, there was strong circumstantial evidence of the defendant's guilt that was strengthened by evidence of the defendant's numerous inconsistent statements to police regarding his whereabouts and actions on the night of the robbery. See *Cramer* v. *Commonwealth*, 419 Mass. 106, 111 (1994) ("Inconsistent statements may be interpreted as showing consciousness of guilt"). See also *Commonwealth* v. *Bonomi*, 335 Mass. 327, 348 (1957) (consciousness of guilt may be inferred from defendant's wilfully false statements).[26]

*Judgment affirmed.*

---

[26]A trial judge is not required to instruct on consciousness of guilt; the evidence suggesting consciousness of guilt may simply be left "for the jury's reflection unadorned by comment either by [counsel] or the judge." *Commonwealth* v. *Simmons*, 419 Mass. 426, 435-436 (1995).